202 P.2d 1080

## JONES v. INTERNATIONAL MINERALS & CHEMICAL CORPORATION et al.

### No. 5161.

Supreme Court of New Mexico.

Feb. 16, 1949.

Leonard T. May, of Carlsbad, for appellant.

Caswell S. Neal, of Carlsbad, for appellees.

McGHEE, Justice.

The appellant (hereafter called the claimant) was injured while engaged in repairing an ore bucket elevator in the potash refinery of his employer, and sought to recover from 50% to 75% for total disability and for disfigurement, plus a fifty per cent penalty for the claimed failure of such employer to furnish reasonable safety devices for his use, and for failure to provide a guard for such elevator. In their answer the defendants admitted that the claimant was injured while in the employment of the mining company, but alleged that the disability was confined to a 25% loss of the use of his right arm, based upon an amputation at the shoulder. They also pleaded that the claimant was injured on account of his failure to use safety devices provided by them in the form of two electrical switches controlling the operation of the bucket elevator, and to comply with a safety regulation, and asked that his compensation be reduced by 50% for such failure.

The jury found that the disability of the claimant was confined to the right arm alone and that a fifty per cent disability existed thereto, allowed $300 for disfigurement, and found that the accident occurred because of the failure of the claimant to block off or to see that the lower switch at the switchboard was blocked off and tagged with a warning sign. Judgment was thereafter entered in accordance with such findings; that is, the ordinary award was reduced by fifty per cent on account of the failure of the claimant to use the safety device or the safety tag on the lower switch.

The employer is engaged in the business of mining and refining potash in Eddy County. The refinery was shut down for repairs and the claimant and the members of his crew were directed to repair a bucket elevator used for carrying potash from the ground level to the top of the refinery. Power to operate the elevator was furnished by an electric motor, and cutoff switches were installed at the top of the elevator and at the bottom. After receiving instructions to make the repairs one of the claimant's associates locked off the upper switch with a cotter key and tested it with a screwdriver to see that the current

was shut off, but neither the claimant nor his associates locked off the switch at the bottom, or attached a warning tag. The workmen then took off a steel plate which covered and served as a guard for the ore buckets and the claimant then entered the elevator. While he was engaged in the repairs the current was in some manner turned on at the lower switch which caused the bucket elevator to start and injure the claimant.

The employer had in force the following safety rules, among others:

"(a) No employee shall remove, displace, damage, destroy, carry off, or fail to use any safety device, safeguard, notice or warning, or interfere with the use of any method of process adopted for the protection of an employee, or fail or neglect to follow and obey safety orders promulgated by the department heads or Safety Engineer, or interfere in any other way with things reasonably necessary to protect the life, health, safety and welfare of employees, including himself.

"(b) Electrical equipment must have the controlling switches locked in the open position before repairs are started."

There was also a rule in effect that when an electrical switch was locked open it must be tagged with a warning tag, and tags were furnished by the employer. This rule was not followed in this case, although one of the claimant's crew had such a tag in his pocket at the time the upper switch was locked off with the cotter key.

It was established at the trial through an official electric inspector of the State of New Mexico (and who was also a former employee of one of the potash companies operating in Eddy County), that the switches used by the employer were standard switches and were used by two of the three potash companies operating in that district, and that they met the requirements of our mine safety act. The claimant offered evidence to show that a third potash company used a different and safer switch, but it was excluded by the court upon the objection of the defendants. His offer is as follows: "Mr. May: Comes now the plaintiff and offers to produce testimony from the witness T. L. Benswanger that in another potash mining industry in Eddy county, New Mexico, that safety devices are used in addition to the 'stop-start' switches which are contended by counsel for defendant as being wholly adequate and that they are safety devices. The offer of proof is that T. L. Benswanger would testify that the United States Potash Company in addition to the 'stop-start' magnetic switches uses a disconnecting switch which completely disconnects the power from the motor at the top of the elevator and at or near the place of the switch until said disconnecting switch is thrown to the 'on' position manually."

The trial court sustained an objection made by the defendants to the offered proof, stating: "The offer will be denied because there are specific safety devices, and that in those regulations there are no requirements that switches such as these may be provided."

This brings up the crucial point in the case, that is, whether mining companies are required to provide only these safety devices required by the Mine Safety Act of 1933, L. 1933, Ch. 153, 1941 Comp. Sec. 67-301 et seq., in order to escape the fifty per cent penalty to an injured workman as originally provided by the 1917 Workmen's Compensation Act, or whether the 1937 amendment required that they also furnish safety devices in general use in the industry or suffer such penalty.

Section 5, of Chapter 92, Laws of 1937, Comp. 1941, Sec. 57-907, amended the safety device provision of the then Workmen's Compensation Act Sec. 156-107, 1929 Comp., and we will italicize that part added by such amendment. The section as amended reads: " * * * In case an injury to, or death of a workman results from his failure to observe a statutory regulation appertaining to the safe conduct of his employment, or from his failure to use a safety device provided by his employer, then the compensation otherwise payable under this act [§§ 57-901—57-931] shall be reduced by fifty per centum (50%). In case an injury to, or death of, a workman results from the failure of the employer to provide the safety devices required by law, *or in any industry in which safety devices are not provided by statute, if an injury to, or death of, a workman results from the negligence of the employer in failing to supply reasonable safety devices in general use for the use or protection of the workman,* then the compensation otherwise payable under this act [§§ 57-901—57-931] shall be increased by fifty per centum (50%). *Provided further, that any additional liability resulting from any such negligence on the part of the employer shall be recoverable from the employer only and not from the insurer, guarantor or sureties of said employer under this act except that this shall not be construed to prohibit employers from insuring against such additional liability."*

It is to be noted that the penalty is suffered in two instances by the employer, viz, (a) if injury to, or death of, a workman results from failure of the employer to provide the safety devices required by law; or (b) in any industry in which safety devices are not provided by statute, if injury to, or death of, a workman results from the negligence of the employer in failing to supply reasonable safety devices in general use for the use or protection of the workman.

It seems clear that when the legislature enacted the statute in its present form it

had in mind industries of two kinds, namely (1) those in which named safety devices are required by law, and (2) those in which specific safety devices are not required by law. As to the former, the penalty was to be incurred only in the event death or injury resulted to the workman from the employer's failure to provide some safety device required by law. As to the latter, the penalty would be incurred only if death or injury to the workman resulted from the employer's negligence in failing to supply some "reasonable safety devices in general use" for the workman's protection. Our case of Flippo v. Martin, 53 N.M. 402, 200 P.2d 366, furnishes a good illustration of the liability of an employer in an industry in which specific safety devices are not required. In that case the employer was a well driller and we approved the allowance of the penalty where an employee was injured on account of the failure of such employer to furnish a safety device in general use in the drilling industry.

 In no industry known to our law has the legislature gone into as much detail in requiring all manner of safety devices as in mining. As above stated, the expert witness produced by the claimant testified that the switches provided by the employer met the requirements of our mine safety act, and in addition we do not think that the use by one employer when there are three engaged in the same industry establishes the "general use" required by the statute.

 The claimant also urges that the trial court erred in withdrawing from the consideration of the jury his claim for the fifty per centum penalty because of the failure of the employer to properly guard the bucket elevator. His argument in this connection is based upon the failure of the employer to furnish a safety or disconnect switch, and that this would have had the effect of guarding the bucket elevator while the repairs were being made, citing Janney v. Fullroe, Inc., 47 N.M. 423, 144 P.2d 145, where we held that the term "appropriately guarded" as used in the mine safety statute was a relative term. A sufficient answer to the first contention is that the switches provided by the employer met the requirements of the mine safety act, and as to what we said in the Janney case we remind the claimant that we were there dealing with a different situation. In that case the workman was injured while oiling moving machinery that was not guarded. In this case the ore buckets were enclosed, the machinery had been stopped, and the claimant himself had assisted in removing a steel plate in order to get to the bucket.

 The claimant next complains of the action of the trial court in giving to the jury instructions 8, 9 and 10, which submitted to the jury the question of the safety devices furnished to the claimant,

whether the claimant had failed to make use thereof, and finally whether such failure caused his injury. At the end of each instruction an interrogatory was propounded to the jury and they are also copied, together with the answers. These instructions, interrogatories and answers read as follows:

"8. You are instructed that if you find from the evidence that the elevator bucket upon which plaintiff was injured when working was controlled by a switch at the top and a switch at the switch panel in the mill and that before entering the bucket to make repairs thereon, the plaintiff failed to lock said switch on the switch panel in an off position or to see that said switch was so locked or failed to tag the same with a 'danger' tag furnished by the company for such purpose, if you find such tags were available to the plaintiff, and find that the bucket was accidentally started while plaintiff was making repairs thereon, and that the same would not have started unless some one had pushed the switch on the panel board in the mill controlling the elevator and further find that the said bucket elevator would not have been so started had the switch at the switch panel been locked in the off position or tagged with a warning or danger tag and that the accident which injured the plaintiff would not have happened had either of these precautions been taken, you should find for the defendant on its defense that plaintiff failed

to use a safety device provided by the defendant for his use.

"You are therefore propounded the following interrogatory:

"1. Did the accident occur because of the failure of the plaintiff to block off or see that the lower switch at the switch board was blocked off or tagged? Answer 'Yes' or 'No' as you shall find.

"Answer: Yes.

"9. You are instructed that at all times material to this case there was in force in New Mexico a statute which made it the positive duty of the plaintiff to follow and obey safety rules or orders promulgated by his employer and to do every other thing reasonably necessary to protect his life and safety. This statute made it the duty of the plaintiff to follow and obey safety rules or orders promulgated by his employer mining company having relation to rules, regulations, safety methods and practices promulgated by the defendant potash company for the safety of its employees. You are further instructed that it appears from the evidence in this case that prior to plaintiff's injury the potash company had placed in effect the following rule: 'Electrical equipment must have the controlling switches locked in the open position before repairs are started.'

"If you find such rule was a rule promulgated for the safety of plaintiff and the other employees of the defendant company, and that plaintiff violated such rule, you

will take into consideration such fact in answering the interrogatory following this instruction. The defendants contend plaintiff's injury would not have occurred had the plaintiff complied with the rule. The Court therefore propounds to you the following interrogatories:—

"1. Did the plaintiff obey this rule? Answer 'Yes' or 'No' as you shall find.

"Answer: No.

"2. If you answer the above question in the negative, do you find that such failure was the direct cause of starting the machine? Answer 'Yes' or 'No' as you shall find.

"Answer: Yes.

"10. You are instructed that the term 'safety device' as used in the Workmen's Compensation Act of this State means and includes all things which will lessen danger or secure safety. It may mean a device attached to or a part of or connected with a machine or industrial unit or one not necessarily physically attached to or a part of the machine or industrial unit causing injury. The term is intended to include and does include any instrumentality provided by an employer for use by an employee in the operation or repair of a machine or the performance of his duty which in the operation or repair of a machine or in performance of his duty reduced danger or hazard to the employee.

"Bearing in mind the foregoing definition, the Court propounds to you the following interrogatory:—

"Were the electric switches in evidence herein safety devices? Answer 'Yes' or 'No' as you shall find.

"Answer: Yes."

■ We hold that part of the penalty provisions added by the amendment in 1937 do not apply to an industry where specific safety regulations are provided by statute, and that therefore the trial court did not err in its holdings in this respect.

■ The claimant next contends that the finding of the jury as to the extent of his disability is contrary to the undisputed evidence in the case. We have examined the testimony on this point and find that the finding of the jury in this respect is amply sustained by the evidence.

The judgment will be affirmed, and it is so ordered.

BRICE, C. J., and LUJAN, SADLER and COMPTON, JJ., concur.